**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| MEGAN MARIE BROWN, | ) | CASE NO. 1:25-CV-2094 |
| | ) | |
| Plaintiff, | ) | JUDGE J. PHILIP CALABRESE |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.    INTRODUCTION

The Commissioner of Social Security denied Plaintiff Megan Marie Brown's application for Supplemental Security Income (SSI). Ms. Brown seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule 72.2(b). (*See* ECF non-document entry dated Oct. 2, 2025.)

For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II.    PROCEDURAL HISTORY

In January 2021, Ms. Brown applied to the Social Security Administration (SSA) seeking SSI benefits; she initially claimed that she became disabled on May 1, 2012, but later amended that date to January 21, 2021. (Tr. 18, 207, 583–84.)[1] She identified eight allegedly disabling conditions: (1) celiac disease; (2) Addison's disease; (3) neuropathy; (4) hyperthyroidism; (5) non-epileptic seizures; (6) acute intermittent porphyria; (7) depression; and (8) anemia. (Tr. 250.)

---

[1] The administrative transcript appears at ECF No. 6. I will refer to pages within the transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 568"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 14") and page-identification numbers (e.g., "PageID# 1129").

1

The SSA denied Ms. Brown's application initially and upon reconsideration. (Tr. 78, 87, 89, 98.) Ms. Brown requested a hearing before an administrative law judge (ALJ). (Tr. 136.) Ms. Brown's counsel submitted a brief in advance of the hearing. (Tr. 298–302.) The ALJ held a hearing on September 14, 2022, at which Ms. Brown was represented by counsel. (Tr. 14–46.) Ms. Brown testified, as did an independent vocational expert (VE). (*Id.*)

On December 29, 2022, the ALJ issued a written decision finding that Ms. Brown was not disabled. (Tr. 99–113.) After the SSA Appeals Council denied review (Tr. 1), Ms. Brown sought judicial review in this court. (Tr. 575–77; *Brown v. Comm'r of Soc. Sec.*, Case No. 1:23-cv-2261-BMB (N.D. Ohio)). The parties ultimately stipulated to a Sentence Four remand, and the court ordered the remand in March 2024. (*Id.*; *see also* Order, ECF No. 13 in Case No. 1:23-cv-2261-BMB (N.D. Ohio Mar. 28, 2024.))

As a result of this court's remand, the SSA Appeals Council sent the matter back to the Office of Hearing Operations in May 2024. (Tr. 598.) The Appeals Council's order stated that the original decision "did not contain an adequate evaluation of the prior administrative findings in assessing the claimant's residual functional capacity," in that the ALJ did not explain why the social limitations opined by the state psychological consultants were not adopted. (Tr. 600.) The remand order instructed the ALJ to give further consideration to the prior administrative findings and to give further consideration to Ms. Brown's maximum residual functional capacity and provide additional rationale in support of the assessed limitations. (Tr. 600–01.)

Ms. Brown's counsel submitted a brief in advance of the second hearing in the matter. (Tr. 765–68.) On May 25, 2025, the ALJ held a second hearing, at which Ms. Brown and a VE testified. (Tr. 578–97.)

On June 5, 2025, the ALJ issued a second written decision finding that Ms. Brown is not disabled. (Tr. 549–68.)

On October 2, 2025, Ms. Brown filed her Complaint, challenging the Commissioner's final decision that she is not disabled. (ECF No. 1.) Ms. Brown asserts the following assignments of error for review:

> The ALJ's RFC finding is unsupported by substantial evidence. The ALJ failed to follow the Court's and Appeals Council's remand orders. The ALJ failed to evaluate the prior administrative medical findings pursuant to the revised regulations. The ALJ failed to build an accurate and logical bridge from the evidence to the functional abilities and limitations within the RFC finding.

(Pl.'s Merit Br. at 14, ECF No. 7, PageID# 1129.)

## III.  BACKGROUND

### A.  <u>Previous Applications for Social Security Benefits</u>

Ms. Brown previously applied for Disability Insurance Benefits (DIB) and SSI benefits on November 12, 2014, alleging disability beginning on that day. (*See* Tr. 50.) An ALJ issued a written decision denying the application in June 2017. (Tr. 47.) In that decision, the ALJ found that Ms. Brown had the following severe impairments: (1) "pseudoseizures"; (2) status post salpingo-oopherectomy; (3) Addison's disease; (4) hypothyroidism; (5) cyclic nausea; (6) obesity; (7) an affective disorder; and (8) history of cannabis use. (Tr. 53.)

The ALJ concluded that acute intermittent porphyria (AIP) was not a medically determinable condition "[b]ased on the negative diagnostic studies." (Tr. 54.) He reasoned that "despite [Ms. Brown's] persistent allegation of AIP, the overwhelming weight of the objective record simply does not support that diagnosis." (*Id.*) Nevertheless, he noted that Ms. Brown "has symptoms that could possibly be attributed to that condition" and wrote that he would address those symptoms "in the evaluation of the Addison's disease." (*Id.*)

3

The ALJ ultimately concluded that Ms. Brown had the residual functional capacity to perform sedentary work with certain additional limitations. (Tr. 56.) Specifically, Ms. Brown cannot climb ladders, ropes, or scaffolds or work around hazards like unprotected heights and dangerous machinery. (*Id.*) She cannot engage in commercial driving. (*Id.*) She can frequently stoop, kneel, or crouch, but she can only occasionally crawl. (*Id.*) She can perform simple, repetitive tasks not involving a fast assembly line pace or strict production quotas, although she can meet "end of day goals." (*Id.*)

Based on these and other findings, the ALJ determined that Ms. Brown was not disabled. (Tr. 70.)

Ms. Brown filed another application for SSI benefits on January 21, 2021, alleging disability beginning on that day. (Tr. 102.) An ALJ issued a written decision denying that application in December 2022. (Tr. 99.) In that decision, the ALJ found that Ms. Brown had the following severe impairments: (1) "pseudoseizures"; (2) endocrine impairments of Addison's disease and hypothyroidism; (3) gastrointestinal impairments of cyclic nausea and early colitis; (4) obesity; and (5) adjustment disorder. (Tr. 105.) In summarizing the medical evidence, the ALJ noted that Ms. Brown had been evaluated for potential AIP without a confirmed diagnosis, and the ALJ concluded that Ms. Brown's report of a diagnosis "is not supported by the medical evidence of record." (Tr. 109.)

The ALJ almost entirely incorporated the residual functional capacity set forth in the 2017 decision, except that Ms. Brown was further limited to only frequent balancing. (*See* Tr. 108.) The ALJ also adjusted the non-exertional limitations, finding that Ms. Brown "can understand, remember and carry out simple instructions" to perform work without hourly quotas. (*See id.*)

4

Based on these and other findings, the ALJ again found that Ms. Brown was not disabled. (Tr. 113.)

### B.       Personal, Educational, and Vocational Experience

Ms. Brown was born in October 1982 and was 38 years old on the date of her application. (Tr. 207.) She graduated from high school and received vocational training in cosmetology. (Tr. 251.) She has held a driver's license until 2019, but she did not renew her license due to illness and the COVID-19 pandemic; she currently does not drive. (Tr. 21.) She lived alone for at least ten years, (Tr. 20), but between the first and second hearings in this matter she moved in with her brother. (Tr. 585, 587–88.) She previously worked as a hairdresser (from 2007 to 2011) and for a bill collection agency (from 2008 to 2013). (Tr. 23, 240.) She has not worked since 2013. (Tr. 23.) Her parents support her financially and drive her when she needs to go somewhere. (Tr. 21.)

### C.       Function Reports

Ms. Brown told the agency in October 2021 that beginning in May 2021, she has been in more pain and is vomiting more frequently "due to [her] rare blood disorder." (Tr. 258.) She wrote that she was now unable to perform any household chores or yard work. (Tr. 261.) She explained that the pain in her stomach had worsened and the "daily pain and frequent vomiting cause [her] to feel sick often." (Tr. 262.)

In January 2022, Ms. Brown told the agency that since September 2021, she had been vomiting daily and had lost more than 150 pounds. (Tr. 269.) She wrote that she had been diagnosed with depression in 2021. (*Id.*) She said that she had been engaging in even less activity because she had been vomiting many times a day. (*Id.*) She described that she wakes up in pain, vomiting. (*Id.*) Sometimes the symptoms stop after a few hours, but sometimes she vomits "all day long." (*Id.*) She wrote that she was in "lots of pain" and there was "no cure or [e]ffective treatment." (*Id.*)

5

**D.**     <u>**Relevant Hearing Testimony**</u>

*1.*     *Ms. Brown's Testimony*

Ms. Brown testified at the first hearing that she was let go from her part-time job at the bill collection agency in 2013 because she had been frequently ill, causing her to be absent or to spend too long in the bathroom. (*See* Tr. 23.) She had been a full-time hairstylist, too, but as she got sicker she lost clients because her illness made her unreliable. (Tr. 24.)

She described that she is "functional" only two or three days a week. (Tr. 27.) She throws up intermittently throughout the day and is in extreme abdominal pain, to the point that she cannot "stand up straight." (*Id.*) She estimated that she spends half of her morning vomiting on most days. (Tr. 34.) There are times that she has to stay in the hospital for two or three days at a time. (Tr. 28.) She said her doctors have ascribed the vomiting to her Addison's disease—because her adrenal gland does not work, her intestinal tract does not work properly and vomiting is "just part of it." (Tr. 36–37.)

She said she lived for three years on "very heavy pain medication," during which time she rarely left her bed. (*See id.*) She stopped taking those medications and currently takes no medication because she "can't live like that." (*Id.*)

When the ALJ asked Ms. Brown why she had tested positive for fentanyl on a toxicology screen, Ms. Brown testified that her estranged husband had planted the drug in her pill bottle, an act that caused him to serve time in prison. (*See* Tr. 29.) She currently smokes marijuana, which helps her with her pain and nausea. (Tr. 32.)

Ms. Brown takes ondansetron (Zofran) for nausea every four to six hours. (Tr. 30.) She uses massage equipment, a tanning bed, and a "bean bag" for comfort. (*Id.*) But even then, there are days that she cannot stand up. (*Id.*) There are days that she is not able to sleep at all, and there are other days where she sleeps all day. (*Id.*)

6

She usually wakes up at around 10:00 in the morning, needing to vomit. (*Id.*) She will then try to go back to sleep. (*Id.*) She usually does not get up and moving until the early afternoon. (*Id.*) Once she gets up, she will go to the living room and lie on the couch. (*Id.*) She spend a lot of time in the bath, because the heat relieves a lot of her pain. (*Id.*) She cooks easy meals in the microwave; she avoids gluten because of her celiac disease. (Tr. 31.)

Ms. Brown testified that she has gained over a hundred pounds in eight months due to her Addison's disease, which has "stop[ped]" her thyroid function. (*Id.*) Her thyroid medication makes her fingers and toes "tingle." (Tr. 32.)

Ms. Brown's father shovels the snow at her home and her mother mows the lawn. (Tr. 33.)

Ms. Brown testified that she shops online for groceries and has them delivered. (*See* Tr. 22.)

When asked about a gap in her treatment history, Ms. Brown said that she had been treating with the Cleveland Clinic, but she did not like her treatment so stopped seeing any doctors and taking any medications for about nine months. (Tr. 22.) When her insurance changed, and she was able to move to treatment with University Hospitals, she began treating there with a general practitioner and a specialist. (*Id.*)

At the second hearing, Ms. Brown testified that she now lives with family because she is "no longer able to stay by [herself.]" (Tr. 585.) She said she stopped working because she was missing too much work after "hospitalization after hospitalization." (Tr. 586.)

Ms. Brown added to her testimony from the first hearing, describing that, while she vomits daily, during "porphyria flares," she will vomit until "there's nothing [but] air" left. (Tr. 587.) She has these flares about once every three months. (Tr. 588.) During a flare, she will often be hospitalized for a week or more, during which she receives infusions. (Tr. 588–89.) She cannot get

7

infusions outside of the hospital because her insurance only covers the treatment in the hospital. (Tr. 589.)

Ms. Brown described abdominal pain that in her right flank under her rib cage, which feels "like somebody is just squeezing and never lets go." (Tr. 589.) By the time of the second hearing, Ms. Brown was again taking pain medication. She testified that she takes morphine and acetaminophen/oxycodone (Percocet). (Tr. 587.) The medications make her "groggy" and tired, so she stays in bed for most of the day. (*Id.*)

Ms. Brown described "brain fog," like she will start to do laundry and then hours later realize she never turned on the washing machine. (Tr. 588.)

Ms. Brown lives with her brother, who is now her primary caregiver. (Tr. 587–88.) She is able to shop at the grocery store, but she has to ride in an electric cart because walking for long causes her body to hurt. (*Id.*)

### 2.    *Vocational Expert's Testimony*

Kathleen Byrnes testified as a vocational expert (VE) at the second hearing. (Tr. 592.)

The ALJ asked the VE to assume that a hypothetical individual with Ms. Brown's age and education was limited to sedentary work with additional limitations. (Tr. 592.) Specifically, the individual could occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs. (Tr. 593.) They can never climb ladders, ropes, or scaffolds. (*Id.*) They can perform no work in high, exposed places or in proximity to moving mechanical parts. (*Id.*) They can perform no driving or operation of machines or equipment. (*Id.*) They can carry out simple instructions and perform work without a specific production rate pace or hourly production quotas. (*Id.*) They can have occasional interaction with coworkers, supervisors, and the general public. (*Id.*) And they can deal with occasional changes in a routine work setting. (*Id.*)

8

The VE testified that such a person could perform the work of a document preparer (DOT 249.587-018), surveillance system monitor (DOT 379.367-010), or address clerk (DOT 209.587-010). (*Id.*)

The VE testified that employers typically tolerate an employee who is off task for up to ten percent of the workday. (Tr. 594.) And they typically tolerate one to two absences per month during a short probationary period of a month or two. (*See* Tr. 595.) After the probationary period, even one absence per month on an ongoing basis would result in discipline, up to termination. (*Id.*)

### E.     State Agency Consultants

A disability examiner (Sarah Loch), a physician (James Cacchillo, M.D.), and a psychologist (Janet Souder, Psy.D.) reviewed Ms. Brown's claim at the initial review level. (Tr. 78–88.)

Dr. Souder opined that Ms. Brown has no limitation in her ability to understand, remember, and apply information, but she has moderate limitations in her ability to interact with others, to adapt and manage herself, and to concentrate, persist, and maintain pace. (Tr. 83.) Dr. Souder opined that Ms. Brown remains capable of completing both simple and moderately complex tasks without unusual production standards. (Tr. 86.) Dr. Sounder assessed that Ms. Brown could tolerate occasional and superficial interaction with others in a work setting and is capable of performing tasks where changes are infrequent. (*Id.*)

Dr. Cacchillo adopted the residual functional capacity from the 2017 ALJ opinion, assessing that Ms. Brown can perform sedentary work, except that she cannot climb ladders, ropes, or scaffolds or work around hazards like unprotected heights or dangerous machinery. (Tr. 84.) She cannot engage in commercial driving. (*Id.*) She can frequently stoop, kneel, or crouch, but can only occasionally crawl. (*Id.*)

Based on these opinions, the consultants determined that Ms. Brown could perform the work of a document preparer, stuffer, or garment sorter and was not disabled. (Tr. 87–88.)

In a letter to Ms. Brown explaining this decision, the Agency wrote that it had determined that she was capable of performing work that was less strenuous and less mentally demanding. (Tr. 122.)

At the reconsideration level, these findings were reviewed by a different disability examiner (Brandon Proctor), physician (Lean Hughes, M.D.), and psychologist (Jennifer Whatley, Ph.D.). (Tr. 89–98.) Drs. Hughes and Whatley affirmed the initial-level findings as supported by the record evidence. (Tr. 93–94.) Based on these findings, the consultants affirmed that Ms. Brown is not disabled. (Tr. 98.)

In a letter to Ms. Brown explaining this decision, the Agency wrote that the evidence showed she was still able to move about and function fairly well, and that despite her significant pain she is still able to do "lighter types of work." (Tr. 132.)

### F.      Relevant Medical Evidence

Records from the Cleveland Clinic show that Ms. Brown has sought treatment for reported AIP attacks at least since 2012. She was admitted in August 2012 for severe abdominal pain, with the hospitalist noting that she was being worked up for potential AIP "but without [a] clear diagnosis yet." (Tr. 325.) Her urine porphobilinogen test was normal at that time. (Tr. 326.) She sought treatment for abdominal pain for potential AIP in July 2015. (Tr. 324–25.) The hospitalist noted that she had a "history of frequent hospitalizations with [the] same symptoms," which the doctor attributed to either "p[or]phyria vs psychiatric cause vs opiate seeking/secondary gain." (Tr. 324.) Urine porphyria lab work was again normal at that time. (*Id.*)

Ms. Brown consulted with Hussein Hamad, M.D., on October 13, 2020, to be evaluated for possible acute intermittent porphyria (AIP). (Tr. 309.) She described that for eight years she

10

has had chronic pain in the right back and flank, radiating to the front, which she rated as a constant five on a scale of one to ten. (*Id.*) She said that some days, her pain is so severe that she cannot get out of bed. (*Id.*) She described urine color changes and said she has cyclic attacks requiring hospitalization. (*Id.*) She reported intermittent vomiting and chronic neuropathic pain. (*Id.*) Ms. Brown said that she had genetic testing in 2016 at the Mayo Clinic, and that further workup by a hematologist at the Cleveland Clinic revealed AIP. (*Id.*) She said that she had developed depression since her diagnosis. (*Id.*; *but see* Tr. 383 (responding "no" in an intake questionnaire to questions regarding depressive symptoms)). She said that she had previously been prescribed Percocet but stopped taking it because she "functions better . . . off of opiates." (*Id.*)

On examination, Ms. Brown was in no acute discomfort. (Tr. 310.) She displayed tenderness in the right upper quadrant of the abdomen, the flank, and the low back, but otherwise the examination was normal. (*Id.*)

Dr. Hamad ordered lab work and sent out for Ms. Brown's records from the Cleveland Clinic. (Tr. 311.) He discussed that, with porphyria, there are "acute symptoms which resolve and respond[] well to hematin," but there can also be "chronic neurovisceral pain" that is "more challenging and sometimes require[s] opiates . . . ." (*Id.*) He wrote that, pending a diagnosis verification, and if she were having frequent attacks, they could consider prophylactic hematin or givosiran treatment. (*Id.*)

Ms. Brown presented to the emergency department on November 19, 2020, complaining of abdominal pain for three days, worsening chronic neuropathy in her right leg, and some vomiting and bowel changes. (Tr. 330.)[2] She rated her pain as an eight. (Tr. 337.) She told the

---

[2] Between these visits, Ms. Brown was treated for oil gland dysfunction in her eyes; she was prescribed an antibiotic and an ointment and then was continued on the ointment, along with using warm compresses at bedtime. (Tr. 326–27.)

11

emergency department providers that her symptoms were "similar to prior episodes of porphyria." (Tr. 330.) An initial physical examination was normal, although she displayed mild abdominal tenderness later in the day. (Tr. 331–32; 337.) She was not able to tolerate carbohydrates and was started on intravenous glucose; she was given two doses of morphine for intractable pain. (Tr. 332.)

The emergency provider's clinical impression was AIP, and the hospital admitted Ms. Brown while they sent for a porphobilinogen test. (Tr. 334, 341.) The test ultimately came back within the reference range. (*See* Tr. 350.)

Ms. Brown was treated with intravenous dextrose and pain medications, resulting in improvement. (Tr. 344.) She was discharged on November 21, 2020, with a final discharge diagnosis of AIP. (Tr. 343.) By that time, she was able to eat satisfactorily, and her flank and abdomen was nontender. (Tr. 343–44.)

Ms. Brown followed up with Dr. Hamad on November 24, 2020. (Tr. 312.) She reported that she had continued to have occasional vomiting after her discharge. (Tr. 313.) On examination, there was right upper quadrant abdominal tenderness, but otherwise the examination was normal. (*Id.*) Dr. Hamad reviewed Ms. Brown's labs from the Cleveland Clinic and Mayo Clinic and concluded that they are "not impressive" for AIP. (Tr. 316.) He also noted that previous genetic testing had been negative for a mutation in the hydroxymethylbilane synthase (HMBS) gene. (*Id.*) But he noted that normal results between attacks "do not rule out the diagnosis." (*Id.*) Ultimately, he wrote that the diagnosis was not confirmed but referred Ms. Brown for repeat genetic testing. (*Id.*)

On January 28, 2021, Ms. Brown consulted with Meredith Hale, D.O., at a primary care appointment. (Tr. 415.) Ms. Brown reported that she has AIP attacks about once a month, which usually manifest as abdominal pain. (Tr. 416.) She manages the condition with ondansetron

12

(Zofran), which provides some relief. (*Id.*) She reported "rare seizure activity" during these attacks. (*Id.*) She complained of chronic neuropathy in her legs and hands. (*Id.*) She said she had missed a hematology appointment the previous day because she was too ill. (*Id.*) Ms. Brown reported that she has no celiac symptoms when she avoids gluten and that her anxiety and depression were stable at this time without medication. (*Id.*) A physical examination was normal. (Tr. 418.)

Dr. Hale started Ms. Brown on a low dose of gabapentin to treat the pain and tingling in her extremities. (Tr. 415.) She referred Ms. Brown to neurology for consideration of restarting an antiepileptic medication. (*Id.*) Ms. Brown said that she would provide medical records regarding her Addison's disease for Dr. Hale to review. (*Id.*) She referred Ms. Brown to a gastroenterologist regarding the celiac disease. (*Id.*)

On March 3, 2021, psychologist John S. Reece, Psy.D., completed a psychological evaluation by telehealth as part of Ms. Brown's disability proceeding. (Tr. 420–25.) Ms. Brown reported that she had been in a romantic relationship with a partner for five years, although they do not live together. (Tr. 421.) She described her mood as "good," although it varies based on her physical symptoms. (Tr. 422.) She said she feels depressed because of her medical problems. (*Id.*) She reported problems with anxiety. (*Id.*) She visits with her partner daily and spends her day "doing personal care tasks, doing some household tasks, preparing food, doing some errands, and on the couch." (Tr. 423.) She said she was able to clean and shop. (*Id.*)

On examination, Dr. Reece noted that Ms. Brown sometimes put her fingers in her mouth, which he described as an "outward sign of anxiety." (*Id.*) Her prevailing mood was mildly to moderately anxious and dysphoric, with some tears. (*Id.*) Dr. Reece assessed a chronic, moderate adjustment disorder with depressed mood. (Tr. 424.) He noted that she reported no problems in her past workplaces, had no difficulty concentrating during the examination, and reported a history of

13

sustained and satisfying relationships. (Tr. 425.) He opined that she has "[c]urrent deficits in dealing with stress and pressure in the workplace" including "depression and anxiety." (*Id.*)

On August 10, 2021, Ms. Brown presented to the emergency room reporting that she had been in the midst of an acute AIP flare for the last nine days. (Tr. 498.) She reported pain in her right side, rated at a ten out of ten and radiating into her back. (*Id.*) On initial examination, she was in moderate distress but otherwise the examination was normal. (*Id.*) She was initially treated with hydromorphone (Dilaudid), and she was given a second and then a third dose when she reported that her pain was "untouched." (Tr. 500.) She was alternating between resting comfortably and vomiting and rolling in bed. (*Id.*) The emergency provider wrote that he was unable to tell if this was "a true painful presentation or whether there is some component of drug-seeking." (Tr. 500–01.) Ms. Brown was discharged after she told the providers that "if [they] were unable to control her pain" she would prefer to be discharged so she can manage her symptoms with nausea medicine at home. (*Id.*)

Ms. Brown presented to a different hospital's emergency department on August 19, 2021, complaining of abdominal pain at a ten out of ten that had been present for several weeks. (Tr. 436.) She said the pain was accompanied by nausea and vomiting, and she reported that pain medication, antiemetics, and dextrose usually resolve her symptoms. (*Id.*) A physical examination was normal except for generalized abdominal tenderness; she also had high blood pressure. (Tr. 440.) She was "histrionic" on presentation, and the providers gave her Dilaudid, Zofran, and dextrose, although they noted that her previous records "indicate a questionable diagnosis of porphyria and suggest med seeking behavior." (Tr. 442.) When Ms. Brown requested an additional dose of pain medication, she was given an additional dose of Dilaudid. (*Id.*) Lab work and CT imaging were unremarkable except for a known cyst, so she was discharged with instructions to follow up with

14

a gastroenterologist and her primary care provider. (*Id.*) She requested another dose of pain medication before discharge, but this was refused. (*Id.*)

On September 6, 2021, Ms. Brown presented to the emergency department complaining of vomiting and abdominal pain radiating to her back and right leg. (Tr. 459.) She reported that she had been in a "porphyria crisis" for about a month and was unable to control her symptoms; she said she had not been able to hold down fluids for three days. (Tr. 461.) A physical examination was normal. (Tr. 462; *see also* Tr. 470.) Imaging of the abdomen revealed cysts and possible early colitis. (*Id.*) She was treated with IV fluids, nausea medicine, anti-inflammatory medicine, and morphine and Dilaudid. (*Id.*; *see also* Tr. 468.) After consultation with Dr. Hamad, the providers admitted her. (*Id.*) She was thereafter treated with dextrose, pain medication, and antiemetics. (Tr. 471.)

By September 7, 2021, she was in no pain and again had a normal physical examination. (Tr. 473–74.) A hematologist consulting on her case noted that genetic testing "did not support the diagnosis" of porphyria, but said her symptoms "could potentially represent porphyria attack however other differential is possible given her diagnosis is not well established." (Tr. 482.) He noted on examination that she had right upper quadrant tenderness in the abdomen and tenderness in the right flank and low back. (Tr. 482–83.) He ordered tests for porphobilinogen and porphyrins. (Tr. 484.)

On September 8, 2021, Ms. Brown reported pain at a nine out of ten. (Tr. 485.) A physical examination was normal, with no abdominal tenderness noted. (*Id.*) She described her pain as better controlled, and she did not have vomiting. (Tr. 490.)

On September 9, 2021, she was discharged. (Tr. 494–95.) The discharging physician noted that diagnostic testing for porphyria was still pending, but Ms. Brown had improved and was

stable. (*Id.*) The doctor wrote that Ms. Brown had tested positive for fentanyl, which was "not explained" as Ms. Brown denied taking street drugs other than marijuana. (*Id.*) The doctor suspected that the marijuana may have been "laced with fentanyl" and recommended that she "stop buying marijuana off the streets." (*Id.*)

Ms. Brown followed up with Dr. Hale in April 2022, reporting abnormal weight gain. (Tr. 545.) A physical examination was normal. (Tr. 548.) Dr. Hale ordered bloodwork. (Tr. 544.)

Ms. Brown consulted with a nurse practitioner in June 2022 regarding a scar on her left elbow that had become swollen. (Tr. 538.)

In May 2024, after moving to Florida, Ms. Brown consulted with Tim Broeseker, M.D., in Tallahassee for an evaluation for AIP. (Tr. 823.) She reported that she had been diagnosed with AIP in Ohio and had her last attack eight months previously, which was successfully treated at Doctors' Memorial Hospital in Tallahassee. (*See id.*) A physical examination was normal. (*Id.*) Dr. Broeseker noted that Ms. Brown was "[i]n general doing well," and he did not feel it was necessary to perform bloodwork. (Tr. 824.) Ms. Brown reported that she was not taking pain medication and did not want any because she "does not want to get back into that routine." (*Id.*) He asked her to follow up in six months. (*Id.*)

Ms. Brown presented to the emergency department by ambulance on June 2, 2024, complaining of worsening abdominal pain, nausea, vomiting, and skin erythema and pruritis for a week. (Tr. 825.) She attributed her symptoms to an AIP flare up. (*Id.*) Her bloodwork was unremarkable, but she was treated with morphine, Dilaudid, Valium, Zofran, Phenergan, Decadron, and dextrose. (*Id.*) A physical examination was normal. (Tr. 826.) After consultation with hematology, Ms. Brown was admitted and hemin was ordered. (*Id.*) Ms. Brown reported that she had been having acute episodes of AIP every three months in Ohio and was receiving three- to

16

five-day hemin infusions once every six months at the Cleveland Clinic. (Tr. 830.) The hematologist ordered porphobilinogen and other tests and noted that hemin was not currently available at the facility. (Tr. 832.)

Ms. Brown continued to have some nausea and fluctuating abdominal pain over the next few  days as the hospital awaited the delivery of hemin and the results of the lab tests. (Tr. 835–44.) On June 6, 2024, Ms. Brown's porphobilinogen test came back normal, but she had slightly elevated "coprobiligen 1," leading the hematologist to  conclude that she "appears to  have congenital porphyria." (Tr. 849.) The hematologist opined that, if she has another acute episode, she would need a "complete porphyria work up" to differentiate the type of porphyria that she has. (*Id.*)

Ms. Brown felt a little better by June 7, 2024, after her first treatment of hemin. (Tr. 850.) She continued improving over the next few days, although her pain and nausea returned when the hospital again ran out of hemin for a time. (Tr. 854–65.) Her pain improved when the treatment was restarted on June 11, and the plan was to  discharge her on June 12, 2024. (Tr. 868–69.) She continued to take Dilaudid every two hours as needed for pain throughout her stay, although by June 11 she was counseled that she "will need to decrease frequency of pain medications prior to discharge home." (Tr. 869.) She was discharged on June 12, 2024, having received hemin for five days. (Tr. 870–71.)

Ms. Brown returned to  the emergency department on June 20, 2024, complaining of abdominal pain, nausea, and vomiting, and concerned about another AIP flare up. (Tr. 878.) She reported that she began having pain a few days after her last discharge. (*Id.*) She was restarted on dextrose and Dilaudid, and she was admitted until more hemin could be obtained. (Tr. 879.) On June 21, 2024, Ms. Brown reported that she needs hemin infusions once or twice a year for acute

17

attacks. (Tr. 886.) By June 22, 2024, her pain was "well controlled" on the pain medication and after her first hemin infusion. (Tr. 892.) She continued improving over the next several days (*see, e.g.*, Tr. 900), and she was prescribed Percocet to use at home "to hopefully reduce IV pain medication usage." (Tr. 902.) She had her last dose of hemin on June 25, 2024 (Tr. 904), and she was discharged on June 26. (Tr. 909.) Her porphobilinogen test remained pending at the time of discharge. (*Id.*)

Ms. Brown sought treatment at the emergency department again on July 3, 2024, complaining of abdominal pain radiating to the right flank, as well as several episodes of nausea and vomiting. (Tr. 920–21.) She also reported "some strange neurologic activity – possibly seizure." (Tr. 921.) She was restarted on dextrose and Dilaudid. (Tr. 924.) The hematologist noted that, during Ms. Brown's last admission, she had elevated levels of porphyrins Coproporphyrin I, Coproporphyrin III, and Pentacarboxyl. (*Id.*; *but see* Tr. 395 (lab report showing an elevated level of Coproporphyrin III in October 2020, which Dr. Hamad interpreted among other tests as "not very impressive" for porphyria, as summarized above)).

By July 4, 2024, Ms. Brown was having continued abdominal pain and was using her IV Dilaudid frequently enough that it was agreed to add morphine to the treatment regimen. (Tr. 927.) On July 5, 2024, the dosage of morphine was increased because she was still endorsing abdominal pain and using Dilaudid frequently, even after the first dose of hemin. (Tr. 933.) Her abdominal pain was improving by July 6, 2024, after the second dose of hemin. (Tr. 939.) By July 7, she felt "the best that she has in a couple of months." (Tr. 945.) She was discharged on July 8, 2024, after five days of hemin infusions, with prescriptions for Percocet and morphine, among other medications. (Tr. 950–51.) She was instructed to follow up with Dr. Broeseker on July 15, 2024. (Tr. 951.)

Ms. Brown was back in the emergency department on October 31, 2024, complaining of abdominal pain worsening over three days despite the use of morphine. (Tr. 955.) The hospitalist noted that she "averages approximately 4 hospital admissions per year due to her condition." (*Id.*) She was started on dextrose, Phenergan, and Dilaudid, which began to improve her symptoms. (*Id.*) Dr. Broeseker recommended holding off on providing hemin. (Tr. 956.) The hospital hematologist noted that Dr. Broeseker had planned to start Ms. Brown on Givosiran, but insurance denied the prescription and they were waiting on approval. (Tr. 963.) The hematologist ordered hemin. (Tr. 966.) She was started on hemin on November 2, 2024 (Tr. 972), and she was doing well by November 3, 2024. (Tr. 976, 981.) Ms. Brown said she tried to decrease her pain medication, but she had increased pain overnight going into November 4, 2024. (Tr. 987, 992.) She reported that she was still in a lot of pain on November 5, 2024, even after four days of hemin, and she requested further doses of hemin. (Tr. 996, 1001.) She received another dose and said she was feeling better on November 6, 2024. (Tr. 1007–08.) Her pain improved over the next couple days (*E.g.*, Tr. 1014), and she was discharged on November 9, 2024. (Tr. 1020.)

Ms. Brown was next in the hospital on March 10, 2025, complaining of abdominal pain, nausea, and vomiting beginning a week ago. (Tr. 1021.) She was admitted and started on dextrose and Dilaudid, in addition to her morphine. (Tr. 1022, 1025.) She began receiving hemin on March 11, 2025. (Tr. 1033.) After five doses of hemin infusion, she was discharged on March 14, 2025. (Tr. 1039.)

Ms. Brown returned to the emergency department on April 5, 2025. (Tr. 1045.) She complained of abdominal pain, nausea, and vomiting worsening over the past two weeks despite pain medications. (Tr. 1046.) As with previous admissions, Ms. Brown was admitted and started on dextrose, Dilaudid, and Zofran. (Tr. 1047.) On April 6, 2025, Ms. Brown reported that she was

19

already beginning to feel better, and she requested that her Dilaudid dose be increased, which was approved. (Tr. 1048, 1050.) It was noted that Ms. Brown's urine porphyrins were normal during her last hospital admission. (Tr. 1052.) She was "[s]lowly getting better" by April 8, 2025, after hemin infusions, but she was still requiring IV pain medication. (Tr. 1062.) She was discharged on April 9, 2025. (Tr. 1064.)

## IV.     THE ALJ'S DECISION

The ALJ determined that Ms. Brown has not engaged in substantial gainful activity since January 21, 2021, the application date. (Tr. 555.)

The ALJ next determined that Ms. Brown had the following severe impairments: (1) obesity; (2) Addison's disease; (3) celiac disease; (4) acute intermittent porphyria; (5) peripheral neuropathy; and (6) adjustment disorder. (*Id.*)

The ALJ found non-severe impairments of heartburn, superficial venous thrombosis in the right basilic vein of the right arm, and hypothyroidism. (*Id.*) The ALJ noted that he considered all Ms. Brown's impairments, including these non-severe ones, when developing the RFC. (Tr. 556.)

The ALJ determined that none of Ms. Brown's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 556.)

The ALJ determined that Ms. Brown had the residual functional capacity ("RFC") to perform sedentary work with a number of additional limitations. (Tr. 558.) Specifically, Ms. Brown can only occasionally stoop, kneel, crouch, crawl, and climb ramps and stairs. (*Id.*) She can never climb ladders, ropes, or scaffolds. (*Id.*) She can perform no work in high, exposed places or in proximity to moving mechanical parts. (*Id.*) She can perform no driving or operation of machines or equipment. (*Id.*) She can carry out simple instructions and perform work without a specific production rate pace (like assembly line work or hourly production quotas). (*Id.*) She can

20

have occasional interaction with coworkers, supervisors, and the general public. (Tr. 558–59.) She can deal with occasional changes in a routine work setting. (*Id.*)

The ALJ found that Ms. Brown had no past relevant work and was 38 years old on the date of her application. (Tr. 566.) He found that Ms. Brown had at least a high school education. (Tr. 39.)

The ALJ then determined that—considering Ms. Brown's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that she could perform, including work as a "document preparer" (DOT 249.587-018), "surveillance system monitor" (DOT 379.367-010), or "address clerk" (DOT 209.587-010). [3] (Tr. 567.)

Accordingly, the ALJ determined that Ms. Brown is not disabled. (Tr. 568.)

---

[3] All of these jobs are listed in the SSA's Emergency Message EM-24027 REV, which set forth heightened evidentiary and articulation requirements for certain occupations. *See Soc. Sec. Admin. Emergency Message 24027: Guidance Regarding the Citation of Certain Occupations at Step Five of the Sequential Evaluation Process*, http://secure.ssa.gov/apps10/referencearchive.nsf/links/06212024022159PM (last accessed July 31, 2026). Here, the vocational expert testified that document preparers now prepare documents for scanning into a computer system, as opposed to microfilming. (Tr. 594.) Surveillance system monitors work outside of government now, too, including in amusement parks and parking garages. (*Id.*) And address clerks now use computers to perform their job functions, as opposed to typewriters. (*Id.*) But the VE testified that, despite these changes, Ms. Brown could perform the jobs as they are generally performed now. (*Id.*)

I am aware of recent cases from this Court addressing ALJs' compliance with EM-24027 when relying on listed occupations, including with respect to the testimony required of a VE to establish that those occupations still exist in significant numbers. *E.g.*, *Schulte v. Comm'r of Soc. Sec.*, 2025 WL 778771, at *4–10 (N.D. Ohio Mar. 12, 2025), *report and recommendation adopted*, 2025 WL 2751014 (N.D. Ohio Sept. 26, 2025); *Tester-Kopec v. Comm'r of Soc. Sec.*, 2025 WL 3628110, at *9–10 (N.D. Ohio Dec. 15, 2025); *Boscaljon v. Comm'r of Soc. Sec.*, 2026 WL 1842604, at *4–8 (N.D. Ohio June 26, 2026), *report and recommendation adopted*, 2026 WL 2045325 (N.D. Ohio July 15, 2026). Ms. Brown does not raise an argument in this appeal regarding the ALJ's compliance with EM-24027, and therefore the Court need not dwell on the matter. *See, e.g.*, *Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517–18 (6th Cir. 2010) (upholding determination that plaintiff's failure to argue a claim in its merits briefs before the district court waived that claim); *cf. Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that arguments not raised in a party's opening appeal brief, as well as arguments adverted to in only a perfunctory manner, are waived.")

## V.      LAW & ANALYSIS

### A.      <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id.* While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails

22

to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B.   <u>Standard for Disability</u>

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations

direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

### C. <u>Analysis</u>

Ms. Brown's sole assignment of error raises several partially overlapping issues. At the core, these arguments posit that her AIP diagnosis is well-supported and will result in her seeking hospital treatment too frequently to hold down steady employment of any kind. She points out that the VE testified that employers will not tolerate even one absence per month on a consistent basis

(*see* Tr. 595), and she argues that she requires hospitalization for several days at a time, several times per year. (*See* Pl.'s Merits Br. at 19–20, PageID# 1134–35.)

The ALJ characterized Ms. Brown's diagnosis of AIP as "dubiously supported." (Tr. 562.) The ALJ noted that "the record contained no genetic diagnostic data supporting an AIP diagnosis, rather the opposite appeared to be true." (*Id.*) And while the ALJ acknowledged that Ms. Brown "endorsed requiring regular hospitalizations for treatment of AIP symptoms," the ALJ found that "the record showed limited treatment of any type until 2024, when [she] had several [inpatient] treatments to provide Hemin infusions therapy." (*Id.*) The ALJ noted, accurately, that "the record did not establish the presence of urine porphyrins which would have established clinical indication for such therapy" during most of these admissions. (*See id.*) And the ALJ found relevant that during Ms. Brown's April 2025 hospitalization, hemin treatment was discontinued after the doctors found no "compelling reason" for that treatment, continuing with supportive care including IV analgesics. (*Id.*, citing Tr. 1062.)

The ALJ also wrote that there were notes throughout the record expressing a "concern for drug seeking behavior," and Ms. Brown received "significant opioid use during admissions" for pain management. (Tr. 563.) He explained that Ms. Brown's clinical presentation was further complicated by "clinical concerns for marijuana and unspecified substance use." (*Id.*)

The ALJ ultimately found AIP to be a severe impairment at Step Two (Tr. 555). The ALJ found, however, that the limitations stemming from that condition are not disabling. The ALJ noted that, despite Ms. Brown's treatment history, she was "able to maintain independence with activities of daily living, was able to spend her day doing personal care tasks, was able to do some household tasks, prepare food, do some errands, spend time on the couch; socialize daily by visits with her significant other and with her parents; visit regularly with her siblings; and was able to clean and

25

shop." (Tr. 563.) He noted, materially accurately, that "physical examinations throughout the period were consistently unremarkable, outside of instances of noted abdominal tenderness and an obese body habitus." (*Id.*)

The ALJ further found the state agency medical consultants' opinions to be partially persuasive, as "supported by the consultants' citation to and discussion of specific evidence of record" and "consistent with the bulk of the evidence of record." (Tr. 564.) The ALJ cited "a large gap in regular treatment for AIP" between 2021 and 2024 and records showing that she "responded well to infusions with occasional administration of Hematin, being seen ever[y] six months at the Cleveland Clinic." (*Id.*) The ALJ acknowledged that "later records do reflect treatment for sporadic flares," but he found that these records did not "show consistent symptoms, such as daily pain/vomiting, as alleged during the hearing." (*Id.*) The ALJ therefore provided for additional limitations, beyond what the medical consultants had recommended, "out of an abundance of caution and in attempts to mitigate potentials for musculoskeletal symptom exacerbations." (*Id.*)

Later, the ALJ explained his reasoning with respect to AIP as follows:

> [T]he claimant premises her disability argument primarily on her AIP diagnosis, records noting the diagnosis even prior to the amended alleged onset date (AOD). In January 2021, the month of the amended AOD, records note that she stopped all medications 1-2 years earlier but also reported daily pain/extremity tingling, along with a history of rare seizure activity.
>
> There appears a small gap in treatment until August/September 2021, when she presented with abdominal pain/vomiting (AIP flare), although there was some question about the validity of the AIP diagnosis. Then, following 2021, treatment records do not show significant impairment until May 2024, at which time, she presented to establish for AIP care after moving to Florida.
>
> As opposed to the debilitating limitations she alleged at the hearing level for the period at issue, this record[] notes that after her AIP diagnosis, she responded well to infusions with occasional administration of Hematin, being seen ever[y] six months at the Cleveland Clinic; this note indicated

> that she was generally doing well and had not had a flare in 8 months. At that time, as opposed to seeking significant intervention, she specifically indicated that she neither needed lab work performed nor wanted to get back on pain medication.
>
> The undersigned does note that she presented for multiple flares over the next 11-month period, including the month after the above-noted treatment in Florida. However, each of these flares were within a 12-month period, the durational period for disability, were sporadic in nature, and based on the overall record, including good control with medication management, there is no indication that the sporadic flares would result in debilitating impairment for a period exceeding the durational requirement.
>
> Finally, although the claimant alleges daily pain/vomiting, this is not shown in the evidence, neither by report on a consistent basis to medical personnel or presentation to emergency medical treatment, emergency treatment occurring but not on a frequency level that would be expected given the daily reported vomiting and debilitating pain levels now alleged.
>
> Her hospitalizations, in fact, are sporadic, generally occurring in a few periods during the nearly four-year period at issue, including August/September of 2021; June/July of 2024; October/November of 2024; and March/April of 2025. Four periods over a four-year time span.
>
> And in May 2024 . . . the record also notes that she had been doing well since her AIP diagnoses, which is consistent with the lack of recurrent treatment. The evidence establishes the ongoing ability to perform work within the above-defined residual functional capacity.

(Tr. 565–66) (internal citations to the record omitted, and line breaks added for readability).

Ms. Brown points out that the ALJ here found AIP to be a severe impairment (in contrast to the previous two ALJ decisions in her case, which had not) but nevertheless adopted a substantially similar RFC as in the previous ALJ decisions. (Pl.'s Merits Br. at 11, ECF No. 7, PageID# 1126.) Ms. Brown then argues that there are several errors in the ALJ's reasoning and conclusions with respect to her AIP which require reversal. I will address each alleged error in turn, but in a different order than she presented them.

27

### 1.    Development of the Record

Ms. Brown argues that the ALJ should have held the record open and requested records of the genetic testing her attorney referred to at the hearing (*see* Tr. 584) and from alleged hospitalizations between 2022 and 2024. (Pl.'s Merits Br. at 24, ECF No. 7, PageID# 1139–40.) She contends that the ALJ failed to comply with this Court's remand order, which instructed that the Commissioner "develop the administrative record, including offering Plaintiff a new hearing" (*See* Tr. 577), and the Appeals Council's remand order, which instructed the ALJ to "take any further action needed to complete the administrative record." (Tr. 601.) She argues that it was unfair for the ALJ to have relied partially on the lack of these records without requesting them, pointing to his statements that "no genetic diagnostic data supporting an AIP diagnosis, rather the opposite appeared to be true" and that "the record showed limited treatment of any type until 2024." (Tr. 562.)

"An ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (citing 20 C.F.R. §§ 404.1517, 416.917). The Court therefore reviews the ALJ's decision not to obtain additional records only for abuse of discretion. *See, e.g.*, *Pasiak v. Comm'r of Soc. Sec.*, 800 F. App'x 301, 304 (6th Cir. 2019) (citing *Halter*, 279 F.3d at 356).

I find no abuse of discretion in this case. As an initial matter, the ALJ did offer Ms. Brown a new hearing as required by the Court's remand order, and the ALJ received additional treatment records from hospital systems in Ohio and Florida after the remand. And in any event, the Appeals Council's remand instructions were directed not at Ms. Brown's porphyria but rather at the social interaction limitations opined by the state agency psychological consultants. (*See* Tr. 600.) Ms. Brown raises no issue about the ALJ's revised consideration of that issue in this appeal. That

28

clearly differentiates this case from ones like *Salvati v. Astrue*, No. 3:08–CV–494, 2010 WL 546490 (E.D. Tenn. Feb. 10, 2010), which she relies on in her brief, and in which the ALJ blatantly failed to follow a specific direction in a remand order. *See id.* at \*6 ("The Appeals Council issued four specific instructions to the ALJ, and he completely failed to follow one of them.")

At the second hearing, Ms. Brown's counsel indicated that there may be genetic testing for porphyria that was not in the record, but he characterized that testing as "kind of inconclusive" on the diagnosis. (Tr. 583–84.) The ALJ stated that it was not necessary to obtain those records, saying that "[i]t seems pretty clear that man[y] doctors have diagnosed her with porphyria." (Tr. 585.) He continued, "So, then, it comes down to functional limitations during this period that we're looking at." (*Id.*) He ultimately did find AIP to be a severe impairment and discussed his conclusions with respect to the functional limitations stemming from that impairment. I see no abuse of discretion in deciding not to obtain admittedly "inconclusive" records where the ALJ nevertheless found the condition not only to be medically determinable (as opposed to in prior decisions), but also severe. I also note that Dr. Hamad's records from 2020 indicate that he reviewed previous genetic testing and found them unsupportive of the diagnosis. (Tr. 316.)

To the extent that Ms. Brown complains that the ALJ did not request additional genetic testing records, such as those ordered by Dr. Hamad, or records that may exist from Ms. Brown's self-reported hospitalizations between 2022 and 2024, I also find the argument unpersuasive. It is not clear that those records actually exist. But more importantly, it was her responsibility to provide the evidence necessary to evaluate her claim. *See* 20 C.F.R. §§ 404.1512(a)(1) ("This duty applies at each level of the administrative review process, including the Appeals Council level if the evidence relates to the period on or before the date of the administrative law judge hearing decision"). This is so because she was in the best position to provide information about her own

29

medical conditions. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). Moreover, she was represented by counsel, and but for records of "inconclusive" genetic testing, her counsel represented at the hearing that the record was complete. (Tr. 582, 584.) There is no evidence that her counsel was incapable of advocating her position or was unfamiliar with the relevant hearing procedures. *See Campell v. Comm'r of Soc. Sec.*, No. 1:12CV1406, 2013 WL 1908145, at *8 (N.D. Ohio May 7, 2013) ("Although the ALJ has the duty to develop the record, such a duty does not permit a claimant, through counsel, to rest on the record and later fault the ALJ for not performing a more exhaustive investigation.").

I therefore conclude that the ALJ did not abuse his discretion in not seeking further medical records, and there is no reversible error with respect to that issue.

### 2. *Evaluation of the State Medical Consultants' Opinions*

Ms. Brown points out that, because of the remand, the state agency consultants' opinions did not factor in her treatment after 2021. (ECF No. 7, PageID# 1136.) She argues that the ALJ's consideration of the supportability of those opinions was "too conclusory," that the medical consultants relied on a "checkbox" form, and that the ALJ failed to explain how their opinions were consistent with the medical evidence. (*See id.* at PageID# 1135–36.)

I again find no reversible error. Social Security Ruling ("SSR") 98-6p provides that "[i]f the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." 1996 WL 374184, at *7 (July 2, 1996). A reviewing court must read the ALJ's decision as a whole. *See Taylor v. Kijakazi*, No. 1:20-cv-01121, 2021 WL 4477865, at *8 (N.D. Ohio Sept. 30, 2021).

Agency regulations state that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior

administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Instead, the SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1). Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id.*

The "supportability" factor looks to how well the medical source supports the opinion with objective medical evidence from the record. *See* 20 C.F.R. § 404.1520c(c)(1). "In other words, the supportability analysis focuses on the physicians' explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (quoting *Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)). The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. See 20 C.F.R. § 404.1520c(c)(2).

"As long as the ALJ discussed the supportability and consistency of the opinion and supported [the ALJ's] conclusions with substantial evidence within his decision, the Court will not disturb [the ALJ's] decision." *Njegovan v. Comm'r of Soc. Sec.*, No. 5:21-CV-00002-CEH, 2022 WL 1521910, at *4 (N.D. Ohio May 13, 2022).

31

Here, the ALJ found the state medical consultants' opinions only partially persuasive. (Tr. 564.) He found those opinions "supported by the consultants' citation to and discussion of specific evidence of record" and "consistent with the bulk of the evidence of record." (*Id.*) The ALJ then identified the gap in regular treatment records between 2021 and 2024, Ms. Brown's positive response to infusion therapy, and the lack of evidentiary support for daily pain and vomiting. (*Id.*) The ALJ then adopted a *more restrictive* RFC than the medical consultants had recommended, "out of an abundance of caution and in attempts to mitigate potentials for musculoskeletal symptom exacerbations." (Tr. 564.)

Being generous, Ms. Brown's argument that the opinions were in the form of a "checkbox" borders on being frivolous. (*See* Pl.'s Merits Br. at 21, ECF No. 7, PageID#1136 for the argument.) Her counsel cites to the medical consultants' statements that "'Expedited RFC (DI 24510.066) and Inability to Sustain RFC (DI 24510.057) do not apply. The checkbox was selected as a systems workaround to complete medical assessments in compliance with the Drummond/Dennard ARs." (*See, e.g.*, Tr. 84.)'" In other words, her counsel complains that the consultants checked a digital box in their system, specifically as a workaround in order to complete the form in the way they felt was appropriate. Not only is that a common, non-material workaround, but it is completely different than the kind of checkbox medical opinions that have been discouraged in our Circuit. *Compare, e.g.*, *Dornan v. Comm'r of Soc. Sec*, No. 1:22-CV-02244-JRA, 2023 WL 8789168, at *10 (N.D. Ohio Dec. 4, 2023) (collecting cases) (a checkbox opinion without explanation is "patently deficient"), *report and recommendation adopted*, 2023 WL 8780713 (N.D. Ohio Dec. 19, 2023).

Turning past that meritless argument, and while I find that the ALJ's decision is materially accurate, I do agree with Ms. Brown that "musculoskeletal symptom exacerbations" is not the best

way to describe her porphyria symptoms. (*See* ECF No. 7, PageID# 1137.) After careful consideration, though, I cannot agree that the ALJ committed reversible error here, where the ALJ clearly discussed supportability and consistency (as discussed above) and supported his opinion with substantial evidence. I discuss the ALJ's consideration of Ms. Brown's porphyria further below.

Here, in addition to the reasons discussed above supporting the reasonableness of the decision, I find that any error in the ALJ's finding that the medical consultants' opinions were partially persuasive would be harmless because the ALJ adopted a more restrictive RFC than the consultants recommended. *See, e.g.*, *Malone v. Comm'r of Soc. Sec.*, No. 1:16–cv–1084, 2017 WL 9485649 (N.D .Ohio May 4, 2017). To the extent that the RFC could be considered more restrictive, the decision was supported by substantial evidence for the reasons stated above and below. Notably, Ms. Brown does not direct the Court to any medical opinion opining on a more restrictive functional limitation than that contained in the RFC.

### 3.    *Alleged Inconsistency and the ALJ's application of* **Earley.**

Ms. Brown alleges that the ALJ's decision is "internally inconsistent" in that he found AIP to be a severe impairment (unlike the previous ALJs) but nevertheless adopted the previous RFC almost wholesale. (*E.g.*, Pl.'s Merits Br. at 11–12, ECF No. 7, PageID# 1126–27.)[4] She acknowledges that the ALJ found that her "severe impairments have changed since July 20, 2017 where Plaintiff now has a clear diagnosis of AIP." (*Id.*, PageID# 1127.) But she complains that

---

[4] Ms. Brown also suggests that the current RFC was too close to the previous ALJ's RFC, with her characterizing the previous RFC as "found deficient by the Appeals Council." (*See* Pl.'s Merits Br. at 12, ECF No. 7, PageID# 1127.) But, as discussed above, the Appeals Council's remand order focused not on the previous RFC as such, but rather on the ALJ's reasoning as it relates to rejecting certain opined social interaction limitations, which are not issue in this appeal.

33

"throughout the decision, the ALJ [despite the finding of a severe impairment] questioned the validity of the diagnosis of AIP and treatment required for AIP." (*Id.*)

I am not convinced that there is reversible error here.

The finding of a medically determinable impairment—even a severe one—does not automatically mean that a claimant has resulting functional limitations in their ability to work. *See e.g.*, *Kubas v. Comm'r of Soc. Sec.*, No. 1:22-CV-00856, 2023 WL 4744279, at *8 (N.D. Ohio July 25, 2023) ("The presence of a severe impairment alone does not automatically warrant an RFC limitation if it does not impact a claimant's ability to work."). Further, "a diagnosis alone is not enough to establish specific functional limitations as a matter of right." *E.g.*, *Thornton v. Saul*, No. 4:20-CV-01420-JRA, 2021 WL 3934332, at *11 (N.D. Ohio June 21, 2021), *report and recommendation adopted*, *Thornton v. Comm'r of Soc. Sec.*, No. 4:20CV1420, 2021 WL 4025192 (N.D. Ohio Sept. 2, 2021) (quoting *Teresa F. v. Saul*, No. 1:18-cv-01967-JRS-MPB, 2019 WL 2949910, at *5 n. 7 (S.D. Ind. July 9, 2019)); *see also* Social Security Ruling 16–3p, 2016 WL 1119029, at *2 (2016) ("Under our regulations, an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability.")).

By way of further background, in *Drummond*, the Sixth Circuit held that principles of res judicata apply in the Social Security context, such that "[w]hen the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Id.* at 842. Thus, "[a]bsent evidence of an improvement in a claimant's condition, a subsequent ALJ is bound by the findings of a previous ALJ." *Id.*

In response to *Drummond*, the SSA promulgated Acquiescence Ruling 98-4(6), which provides as follows:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

Acquiescence Ruling 98-4(6), 1998 WL 283902, at *3 (June 1, 1998).[5]

In *Earley v. Commissioner of Social Security*, 893 F.3d 929 (6th Cir. 2018), the Sixth Circuit clarified *Drummond*'s scope. The court held that, while *Drummond* reached the correct result, it "overstat[ed]" its holding. *Id.* at 933. The court noted that principles of "[f]inality, efficiency, and the consistent treatment of like cases" are important in Social Security proceedings. *Id.* Accordingly, if an individual files a second application covering the same time period as the initial application, res judicata applies unless the claimant provides a justification for revisiting the earlier decision. *Id.*

However, "a claim that one became disabled in 1990 is not the same as a claim that one became disabled in 1994." *Id.* And, "[w]hen an individual seeks disability benefits for a distinct period of time, each application is entitled to review." *Id.* Thus, principles of res judicata "do not prevent the agency from giving a fresh look to a new application containing new evidence or satisfying a new regulatory threshold that covers a new period of alleged disability while being mindful of past rulings and the record in prior proceedings." *Id.* at 931.

*Earley* emphasized that "[f]resh review is not blind review." *Id.* at 934. Thus, "[a] later administrative judge may consider what an earlier judge did if for no other reason than to strive

---

[5] The Agency would go on to rescind Acquiescence Ruling 98-4(6) on December 2, 2024, replacing it with Acquiescence Ruling 24-1(6). *See* Acquiescence Ruling 24-1(6), 89 Fed. Reg. 92922-02, 2024 WL 4870750 (Nov. 25, 2024).

35

for consistent decision making." *Id.* However, by holding that res judicata does not apply to a new claim covering a new time period, *Earley* "significantly walked back administrative application" of *Drummond*. *Dilauro v. Comm'r of Soc. Sec.*, No. 5:19-cv-2691, 2021 WL 1175415, at *3 (N.D. Ohio Mar. 29, 2021).

Here, while the ALJ adopted a similar RFC as the previous application, it is clear that the ALJ gave Ms. Brown's case the "fresh review" to which it was entitled under the relevant law and regulations. The ALJ did not, for example, suggest that he was bound by the previous decision under *Drummond*, to the contrary finding a new severe impairment of AIP not found in prior decisions. Ms. Brown's present application relates to a different time period than her prior claim, and *Drummond* thus does not prevent the ALJ from taking a fresh look at the evidence and adopting an RFC that the ALJ deems appropriate in light of that evidence. *See Earley*, 893 F.3d at 931.

The ALJ did just that, thoroughly analyzing the evidence regarding Ms. Brown's impairments and giving it a "fresh look" before adopting an RFC based on that evidence. The mere fact that the RFC is similar to the prior RFC does not violate the law as it stands in the Sixth Circuit after *Earley*.

I therefore recommend that the Court reject Ms. Brown's argument that remand is warranted because the ALJ's decision is somehow internally inconsistent or violative of *Earley*.

### 4. Substantial Evidence Related to Porphyria and Absenteeism

Ms. Brown's strongest argument is that she had one laboratory test suggestive of acute porphyria and a clinical history supportive of the position that she will be hospitalized too frequently to sustain competitive employment. After very close consideration, I find this case to be a close call. But the ALJ's recitation of the medical evidence is thorough and materially accurate, including notations where urine PBG is normal during reported alleged porphyria attacks.

36

And his ultimate conclusions are supported by substantial evidence. Accordingly, I see no reason to remand.

Ms. Brown points to her numerous recorded hospitalizations and her self-reported (but undocumented, as discussed above) history of frequent hospitalizations between 2022 and 2024, arguing that she cannot sustain consistent employment.

On the one hand, porphyria in general seems difficult to diagnose, and Ms. Brown's clinical course is admittedly similar to that reported in other cases dealing with possible but unconfirmed porphyria. *See Reardon v. Weinberger*, 387 F. Supp. 1210, 1211 (E.D. Pa. 1975) ("It is difficult to diagnose and notorious in mimicking other illnesses."); *Pannell v. Astrue*, No. 3:11–cv–253–J–JRK, 2012 WL 3778988, at *4–5 (M.D. Fla. Aug. 31, 2012) (frequent hospital admissions for abdominal pain and vomiting without a confirmed diagnosis, albeit with abnormal urine porphyrins, followed by an insurance denial for prophylactic hemin outside of the hospital setting).

But on the other hand, Ms. Brown's urine porphyrins were normal during every alleged acute attack except for one, and cases suggest that mildly elevated porphyrins seem not to be a smoking gun for a porphyria. *See Pannell v. Comm'r of Soc. Sec.*, No. 3:23-CV-731, 2024 WL 3205933, at *12 (N.D. Ohio Feb. 28, 2024), *report and recommendation adopted*, 2024 WL 3201111 (N.D. Ohio June 27, 2024). Indeed, in this case Dr. Hamad found that certain elevated levels were not "impressive" for a diagnosis. (Tr. 316.)

In any event, the ALJ's finding AIP to be a severe medically determinable impairment does not automatically mean that Ms. Brown has resulting functional limitations in her ability to work. *See e.g.*, *Kubas v. Comm'r of Soc. Sec.*, No. 1:22-CV-00856, 2023 WL 4744279, at *8 (N.D. Ohio July 25, 2023) ("The presence of a severe impairment alone does not automatically warrant an RFC limitation if it does not impact a claimant's ability to work.").

37

At the end of the day, Ms. Brown points to no persuasive misstatement in the ALJ's recitation of the evidence, and she points to no medical opinion substantiating a functional limitation greater than that included in the RFC. While she certainly obtained some hospital treatment for porphyria in this case, courts have held that similar treatment is not necessarily disabling. *See Kruske v. Saul*, No.: 18-13519, 2019 WL 9654865, at *4 (E.D. Mich. Dec. 31, 2019) (noting a lack of treatment for acute porphyria, where the claimant had received dextrose once and had never been treated with hematin), *report and recommendation adopted*, 2020 WL 3118642 (E.D. Mich. June 12, 2020).

Indeed, this case is similar to *Holloway v. O'Malley*, No. 3:23-CV-475-CCB, 2024 WL 1364790, at *3 (S.D. Ind. Apr. 1, 2024). As in that case, here the ALJ considered Ms. Brown's multiple visits to the emergency room and her visits with other providers, but he reasonably found that the record as a whole showed that her symptoms were not readily diagnosed, intermittent, and lessened or resolved with treatment. *See id.* at *4. No treating or examining medical professional has offered an opinion that the limitations resulting from her impairments are totally work preclusive, or greater than provided in the RFC. *See id.* at *4–5.

In this close case with reports and medical evidence weighing both for and against a firm porphyria diagnosis, I find no reversible error in the ALJ's finding that AIP was a severe impairment but not totally preclusive of sustained work of all kind. Although Ms. Brown insists that she would be absent or off-task an inordinate amount of time if she were to work, the ALJ did not accept that Ms. Brown's subjective symptoms were fully supported by the evidence and, as the evidence does not compel a contrary result, I recommend that this Court not disturb the ALJ's finding.

As there is no basis for remand, I recommend that the Commissioner's decision be affirmed.

## VI.     RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

 Dated:  August 10, 2026            /s/ *Jennifer Dowdell Armstrong*
                                   Jennifer Dowdell Armstrong
                                   U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id*. (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of

the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019)